**DUNNINGTON, BARTHOLOW & MILLER LLP**
Luke McGrath, Esq.
230 Park Avenue, 21st Floor
New York, NY 10169
Tel: (212) 682-8811
lmcgrath@dunnington.com
mangulo@dunnington.com

*Counsel to Prairie Street Capital, Inc.*

**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PRAIRIE STREET CAPITAL, INC.,<br><br>                              Plaintiff,<br><br>     v.<br><br>KOBI AFEK, FOUNDERS EQUITY I, LP, JOHN TEEGER, WARREN HABER, ROSES CONFECTIONS, L.P., ROSES HOLDINGS LIMITED, ROSES RE HOLDINGS, LLC, WEBSTER BUSINESS CREDIT CORPORATION,<br><br>                              Defendants. | Case No. _____<br><br><br>**COMPLAINT AND JURY DEMAND[1]** |

        Plaintiff Prairie Capital Inc. ("**Prairie**" or "**Plaintiff**"), by and through its attorneys Dunnington, Bartholow & Miller LLP, for its Complaint (the "**Complaint**") as to issues arising out of the destruction of value wrought upon Richardson Foods. Inc. ("**RFI**") and Richardson Brands Company[2] ("**RBC**," together "**Richardson**"[3]) against Kobi Afek ("**Afek**"), Founders Equity I, LP ("**Founders**"), John Teeger ("**Teeger**"), Warren Haber ("**Haber**" and collectively

---

[1] Plaintiff submits that some of its claims, if not all, may be tried by a jury and thus have made a jury demand.

[2] As the two Richardson debtors are protected by the automatic stay of 11 USC § 362, references throughout to Richardson are limited to factual allegations, and to support the claims against Roses as successor to Richardson.

[3] Plaintiff refers to RFI and RBC separately as needed to avoid confusion but not to imply separateness as Plaintiff submits, they should be substantively consolidated.

with Founders and Teeger referred to as the "**Founders Parties**"), Roses Confections LP, Roses RE Holdings LLC, Rose Holdings Limited (this trinity, collectively, "**Roses**"), and Webster Business Credit Corporation ("**Webster**") (collectively, the "**Defendants**") alleges as follows:

## I.    PRELIMINARY STATEMENT

Plaintiff has lost and is losing significant rights, claims, and monies while Insiders (defined below) controlling Richardson and Roses have improperly taken significant financial benefits. This is an action to correct insider profiteering and to recover opportunities and monies diverted from Plaintiff.  Some of these transactions and occurrences at issue were previously raised by Deborah J. Piazza, the Chapter 7 trustee (the "**Trustee**") of RFI and RBC in the Bankruptcy and Adversarial Proceeding under Adv. Pro. No. 22- 01103 (JPM), but carved out and preserved for Plaintiff to bring against Defendants.  Plaintiff asserts different direct claims against the Defendants not asserted by the Bankruptcy Trustee and not settled in the Bankruptcy. Central to this case is the improper end run around Prairie's rights under the First Right of Refusal (ROFR), as detailed in Amendment No. 9 and the October Cash Collateral Agreement incorporated by reference herein. Specifically, Prairie exercised its ROFR to purchase the rights to the Richardson candy and gravy business under what was called the "Webster Facility."  Prairie timely accepted and exercised its rights under the ROFR, but the bank, Webster, went "radio silent" and proceeded with a private sale to Roses, denying Prairie the benefits of its bargain.

## II.    NATURE OF THE ACTION

This action is instituted to maintain and protect the Plaintiff's contractual and legal rights in light of the blatant disregard for those rights before, during and after the March 9, 2020, UCC sale of Richardson (the "**March 9 Sale**"). Prairie has been directly harmed by Webster and Richardson, through the breach of the Cash Collateral Credit and Loan Agreement executed on

2

August 23, 2019 (the "**Amendment No. 9**"), as subsequently amended. Roses is the successor in interest to Richardson and is thus named as a Defendant here in that capacity, as well as due to its own culpable actions as detailed herein. The Insiders,[4] individually and collectively, acted in bad faith and ignored contracts thus directly harming Plaintiff. Additionally, the Insiders' actions constituted an *ultra vires* act, in which Founders, Afek, Haber and Teeger acted in their own interests in order to secure the peaceful possession of the Richardson assets (the "**Richardson Assets**") by Webster, which ultimately led to the sale to Roses. Additionally, Webster has control of the RBC shares, and they are currently being held by Webster's attorneys. Webster should deliver the RBC shares to the Court for the benefit of the Plaintiff.

Prairie seeks no less than $8,500,000.00 in damages,[5] plus the amount Plaintiff is contractually obligated to reimburse for its investors' losses, in addition to reputational damages to its business and legal fees incurred.

### III.    JURISDICTION AND VENUE

1.    The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because there is diversity of citizenship and the amount in controversy exceeds $75,000.

2.    Venue is proper under in this District pursuant to 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this District.

3.    The law of the forum is New York.

---

[4] Afek, Teeger and Haber are all insiders of RFI and/or RBC (the "**Insiders**"). 11 USC §101(31)(B). *See Piazza v. Afek et al*, Adv. Pro. No. 22-01103-jpm.
[5] Plaintiff reserves all rights.

## IV.    **PARTIES**

4.    Plaintiff Prairie Street Capital, Inc. (previously defined as "**Prairie**" or "**Plaintiff**") is a corporation organized and existing pursuant to the laws of the State of Wyoming, with its principal office at 1309 Coffeen Avenue, Suite 1200, Sheridan, WY 82801.

5.    Defendant Kobi Afek (previously defined as "**Afek**") is an individual having a primary residence at 332 Starling Road, Englewood, New Jersey. Upon information and belief, at all relevant times through on or about March 9, 2020, Afek was the President and Chief Executive Officer, and a board member, of RFI and RBC.

6.    Defendant Founders Equity I, LP (previously defined as "**Founders**") is a limited partnership organized and existing pursuant to the laws of the State of Delaware, with its principal place of business at 545 Fifth Avenue, Suite 401, New York, New York. Its general partner FEF GP LLC is located at 711 Fifth Avenue, New York, NY 10022.

7.    Defendant John Teeger (previously defined as "**Teeger**") is an individual having a primary residence at 96 Ivy Way, Port Washington, New York. Upon information and belief, at all relevant times, Teeger was the Chairman of the Board of RFI and RBC and a principal of Founders.

8.    Upon information and belief, defendant Warren Haber (previously defined as "**Haber**") is an individual having a primary residence at 784 Park Avenue, Apt. 12B, New York, New York. At all relevant times, Haber was a principal of Founders and a board member of Debtors.

9.    Upon information and belief, defendant Roses Confections, L.P. (previously included in the definition of "**Roses**") a limited partnership organized and existing pursuant to the laws of the State of Texas and licensed to do business in New York, with its principal place of

business at 101 Erie Boulevard, Canajoharie, New York. Its partners are residents of the State of Texas and the State of New Jersey.

10.    Upon information and belief, defendant Roses Holdings Limited (previously included in the definition of "**Roses**") is a corporation organized and existing pursuant to the laws of the State of Texas, with its principal place of business at 6143 Royalton Drive, Dallas, Texas.

11.    Upon information and belief, defendant Roses RE Holdings (previously included in the definition of "**Roses**") is a limited liability company organized and existing pursuant to the laws of the State of Texas, with its principal place of business at 101 Erie Boulevard, Canajoharie, New York. Its sole member is a resident of the State of Texas.

12.    Upon information and belief, defendant Webster Business Credit Corporation (previously defined as "**Webster**") is a corporation organized and existing pursuant to the laws of the State of New York, with its principal place of business at 360 Lexington Avenue, New York, New York. Upon information and belief, Webster is a wholly owned subsidiary of Webster Bank, N.A.

## V.    FACTUAL BACKGROUND

### A.  Richardson

13.    Around January 2006, RFI was formed by Founders in order to purchase RBC. Until March 2020, RBC[6] made a line of candy and gravy products based in Canajoharie, New York.[7]  The Richardson business operated as a combined entity of RFI and RBC. The entire Richardson operation was run and managed as one consolidated entity from at least 2015 onward.

---

[6] Prairie refers to RFI and RBC separately as needed to avoid confusion but not to imply separateness. "**Richardson**" refers to one consolidated entity incorporating both the RFI and RBC assets and liabilities.
[7] At the time of this filing, the "Roses Brands," website contains a detailed history of Richardson Foods business dating back to 1880. *See* **Exhibit A**.

**B.  Richardson in Need of Funds Solicits Prairie**

14.     Pursuant to a Credit and Security Agreement dated as of December 24, 2014, (as subsequently amended, restated, and modified, the "**Webster Facility**"), executed by Richardson and Webster, Richardson borrowed in excess of $5,000,000 from Webster.

15.     In 2017, Founders approached Prairie and asked for help funding Richardson. Prairie brought together two investors, Doge and Talcott. Doge and Talcott each made a loan to Richardson (the "**Doge/Talcott Loans**") on or around February 5, 2018.[8]

16.     At the time of the Doge/Talcott Loans, approximately $3.6 million was outstanding under the Webster Facility. A year after the Doge/Talcott Loans were made, Richardson was struggling, and Webster was losing confidence in management and the owners.

17.     Eventually, Webster wished to reduce the credit limit under the Webster Facility. In order to avoid that, Richardson's parent company, Founders, agreed to post cash collateral to further secure Webster. Specifically, Founders, Teeger and another general partner of Founders, Haber, each made a cash collateral deposit at Webster Bank with a pledge to Webster. *See* the April 15, 2019, Cash Collateral Deposit Agreement, **Exhibit B** (the "**April Cash Collateral Agreement**"). Consequently, Webster agreed not to reduce the credit line to Richardson.

18.     By August 2019, Richardson had engaged an investment bank to sell the Richardson business as a single entity, and Webster requested more cash collateral. *See* ¶20. Prairie agreed to provide an additional cash collateral deposit of $280,000 and pledge to Webster at that time.

19.     The Insiders – Afek, Teeger, and Haber – represented to Plaintiff on numerous occasions that RFI and RBC were one and the same company.

---

[8] Doge loaned $900,000. Talcott loaned $100,000.

20.     Teeger represented to Barry, in early 2018, that the Richardson companies were run as one and the same and they did not have separate financial statements.

21.     Pursuant to this representation as detailed above, Doge and Talcott made two initial loans to RFI in 2018.

22.     During the due diligence phase, the owners and management of Richardson presented financial statements for RFI without indicating any consolidation with RBC. Consequently, the RFI statements displayed receivables and assets, leading the Plaintiff to believe that RFI possessed significant assets. However, Richardson and the Insiders never provided separate statements for RFI or RBC, only consolidated statements that were not clearly labeled as such.

23.     Payments to Plaintiff were all made from the same single Webster bank account used by RBC and RFI for all payments which both companies shared. Doge and Talcott were specifically instructed by Founders to wire the funds for the Doge/Talcott Loans into the RBC bank account which both companies shared.

24.     On May 24, 2019, the invoice sent to RFI by Plaintiff's company for a monitoring fee was paid by RBC. By this transaction, it was reasonable for Plaintiff to believe that RFI and RBC operated as a single entity.

25.     All disbursements made to Prairie were made through the RBC bank account.

26.     Both Afek and Teeger are experienced in accounting and finance, and there was no reason for Barry and Plaintiff to doubt their statements.

27.     In the process of documenting the additional cash collateral deposit and pledge, Prairie discovered that the Webster Facility had been modified five times since Doge and Talcott provided their loans. Prairie was surprised and not pleased with that discovery. Prairie, Doge and Talcott were never told of all the amendments.[9]  Prairie expressed displeasure and pushed for stronger protections.

28.     As a result, an amendment to the April Cash Collateral Agreement, 'Amendment No. 9', was signed on August 23, 2019 by Webster, Richardson, Founders and Prairie (previously defined as the "**Amendment No. 9**").[10]  Significantly, under the Webster Facility, and specifically, Amendment No. 9, Prairie bargained for and Webster, Richardson and Founders agreed to a right of first refusal (the "**ROFR**"), under which Prairie was entitled to purchase 100% of Webster's interest under the Webster Facility (the "**Webster Interest**"), which included all of its loans and security interests.[11]  Accordingly, Prairie had a contractual right to purchase the Webster Interest.

29.     The Amendment No. 9 Cash Collateral Agreement was subsequently amended by a Second Amended and Restated Cash Collateral Deposit Agreement dated as of October 24, 2019 (as amended, the "**October Cash Collateral Agreement**"). Critically, however, the crucial ROFR in favor of Prairie remained unchanged. Webster, Richardson, Founders, Prairie, Teeger and Haber, all executed October the Cash Collateral Agreement that contained and preserved the Prairie ROFR and Founders, Prairie, Teeger and Haber (collectively, the "**Pledgors**") made and pledged certain cash deposits to be held by Webster as collateral security for the obligations of Richardson as defined in the Webster Facility.

---

[9] Prairie and Doge are affiliates.

[10] Over the years, the Webster Credit Agreement was amended numerous times. Herein, as defined above, we will refer to the Credit Agreement and the subsequent amendments, including Amendment No. 9, as the "**Webster Facility**."

[11] Prairie's exercise of the ROFR discussed below accepted the offer to purchase a 100% interest in the Webster Facility.

30.    The Webster cash collateral posted pursuant to the October Cash Collateral Agreement, aggregating $1,092,000, was comprised of the following amounts:

> Founders – $542,000
> Prairie – $280,000
> Teeger – $135,000
> Haber – $135,000

31.    Under the October Cash Collateral Agreement, Prairie was subrogated to the rights of Webster pertaining to the Webster Facility and stepped into Webster's secured position.

32.    As a step, in the March 9 Sale RFI surrendered the RBC shares under the surrender agreement, titled "Acknowledgment of Events of Default, Waiver of Notice, Consent and Peaceful Possession Letter," (the "**Surrender Agreement**") when Richardson surrendered "substantially all" of its assets. Specifically, RFI agreed and consented to Webster taking possession of the "Collateral," as defined in the credit documents:

> Borrowers hereby consent to Lender's exercise of all rights of possession in and to the that Collateral consistent with the Credit Agreement, the Other Documents, and the Uniform Commercial Code as enacted in the State of New York (the "UCC"), to be disposed of consistent with the Credit Agreement, the Other Documents, and the UCC (…)

33.    The language demonstrates that RFI surrendered to Webster "all" of the assets previously defined as collateral for the Webster Facility and the RBC shares were pledged as part of such "Collateral."  Accordingly, RFI surrendered the RBC shares on March 9, 2020, to Webster (which already held the RBC shares in negotiable form) as described in the Surrender Agreement.

34.    At no time did the Trustee seek recovery of the RBC shares and did not reject the Pledge Agreement or any other agreement or obligation restricting or surrendering the RBC shares.

The time to seek the return of the shares would have been during the adversary proceeding, but the Trustee's complaint is devoid of any claim seeking return of the shares.

35.     The Trustee – having abandoned the RBC shares and leaving them in the custody of Webster – then released all claims, known and unknown, against Webster. Such broad releases of the Trustee's claims necessarily included any claims to the RBC shares which RFI previously pledged and surrendered to Webster.

36.     As a result, Prairie is subrogated to the pledge of the RBC shares and is the only party that has an interest in the RBC shares at this time. In other words, Prairie "Steps into the Shoes of Webster" and enjoys all the rights and privileges of Webster under the Pledge Agreement as a subrogee. As the assets of RBC were also surrendered to Webster, Prairie is also subrogated to all of the rights and collateral of Webster including the assets of RBC and RFI.

**C.  Defendants Orchestrate a Scheme to Rob Prairie of its Right of First Refusal**

37.     On February 17, 2020, Roses made an offer to purchase the Webster Interest for $800,000. *See* **Exhibit C**, Roses Letter of Intent.

38.     In late February 2020, once Prairie learned of the Roses offer, it offered $1 million for the Webster Interest. Webster advised Prairie that it would not sell the Webster Interest at less than par. At that point, Prairie agreed to pay par.

39.     On March 3, 2020, Prairie informed Afek that it would be purchasing the Webster Facility, pursuant to the ROFR contained in Amendment No. 9 §(1)(a).

40.     The ROFR clearly grants Prairie the right of first refusal pertaining to the Webster Facility. The ROFR states:

(f) Right of First Refusal. Lender may participate or otherwise sell, assign or transfer any or all of its right, title, and interest in and to the Obligations, the Commitments, and the Loan Documents to any third person at any time; provided,

10

however, that to the extent such sale constitutes 100% of Lender's interests in the Obligations, Commitments and Loan Documents (a "Qualified Loan Sale"), Lender shall first offer to Prairie Street Capital, Inc., a Delaware corporation and pledger of certain cash collateral in support of Borrower's Obligations under the Credit Agreement ("PSC"), a right of first refusal to purchase its interest so offered for Qualified Loan Sale. In the event that Lender offers any such right of first refusal to PSC, PSC shall promptly accept or reject such right of first refusal, but in any event within five (5) Business Days after receipt of such offer notice (the "Option Period"). If the offer is accepted prior to the expiration of the Option Period, the parties shall promptly close the purchase of Lender's right, title, and interest so offered to PSC, and in any event within five (5) Business Days of the written offer thereof by Lender to PSC, failing which Lender shall be free to consummate such Qualified Loan Sale to any such third person without restriction. Anything in the foregoing to the contrary notwithstanding, Lender may sell, pledge, transfer, or assign additional participation interests in the Obligations, the Commitments and the Loan Documents without any of the foregoing restrictions (i) in connection with transfers or assignments of its interests to any Affiliate of Lender, (ii) in connection with a transfer or assignment of all or a substantial part of its loan portfolio, (iii) in connection with a transfer or assignment contemplated under Section 16.3(d) hereof or (iv) to the extent there shall exist exigent circumstances requiring the immediate sale of Lender's interests in and to the Obligations, the Commitments, and the Loan Documents. All terms, conditions and documentation governing any Qualified Loan Sale to PSC shall be in form and substance satisfactory to Lender in its sole discretion. This Section 16.3(f) and the right of first refusal provided herein shall terminate on the date PSC ceases to be a guarantor or obligor of the Obligations or challenges or terminates any guaranty or pledge agreement made by PSC in support of the Obligations.

41.    On March 4, 2020, Prairie wrote to Webster exercising the ROFR and purchasing the Webster Facility. That same day, Webster and Prairie entered into a Non-Disclosure and Confidentiality Agreement ("**NDA**") confirming exercise of the ROFR in order to move forward with the ROFR purchase. *See* NDA attached as **Exhibit D**. Prairie was led to believe that the parties were working towards a deal in accordance with Prairie's exercise of the ROFR. *See* email from Prairie dated March 3, 2020, attached as **Exhibit E**.

42.     Following Prairie's exercise of the ROFR and acquisition of the Webster Facility, Webster's lawyers drafted and sent to Prairie a "Loan Assignment Agreement" to complete the ROFR (the "**Loan Assignment Agreement**"). *See* Loan Assignment Agreement, attached as **Exhibit F**.

43.     Alternatively, if the email sent on March 4 was not considered as an acceptance by Prairie (which it was), then, on March 6, 2020, Prairie agreed to all the terms expressed in the draft Loan Assignment Agreement, through its president Michael Barry ("**Barry**") – completing the sale of the Webster Facility to Prairie under Amendment No. 9.  *See* **Exhibit G**.[12]

44.     Pursuant to the ROFR, Prairie had already agreed to match the pricing of whatever sale price had triggered the ROFR or the full amount due to Webster on the loan (irrespective of any ROFR), and, accordingly, in accepting the offer, Prairie requested that Webster insert the sales price into the Loan Assignment Agreement.  Further, the acceptance was within the timeframe of the ROFR and the timing during which Webster indicated they wanted to close the transaction with Prairie.

45.     By requesting the sales price insert, Prairie confirmed again its acceptance of the offer and willingness to buy the Webster Interest. Consequently, the deal had been struck and an enforceable contract was formed as soon as Barry sent Webster the March 6, 2020, email. *See* **Exhibit G**.

---

[12] The ROFR is contained in Section 16.3(f) of the Amendment No. 9 dated August 23, 2019. *See* **Exhibit H**. The language of that section is clear that Prairie Street has "five (5) Business Days" which is defined as the "Option Period" for a "Qualified Loan Sale." Prairie accepted Webster's original offer to purchase the Webster Interest under Amendment No. 9 through exercising its right of ROFR on or about March 4, 2020. Consequently, Prairie signed the NDA on or about March 4, 2020, and Webster sent its due diligence files to Prairie. The next day, March 5, 2020, Webster sent Prairie a proposed Assignment Agreement with a blank for the purchase price, which further demonstrates that Prairie accepted the offer to purchase the Webster Interest. The ROFR further provides: "If the offer is accepted prior to the expiration of the Option Period, the parties shall promptly close the purchase of Lender's [Webster's] right, title and interest so offered to PSC [Prairie], and in any event within five (5) Business Days of the written offer."

46.     Notwithstanding the ROFR; the offer; and Prairie's acceptance, Webster then went "radio silent" and instead pursued a deal with Roses.

47.     Teeger represented to Prairie's President Barry several times, as a representative of the Plaintiff, that the sale of the Richardson Assets was taking place at an auction. In fact, on March 6, 2020, he told Barry the Richardson Assets were going to be auctioned off next week but could provide no details as to time and location.

48.     As a corporate officer of Richardson and as Chairman of the Board of RFI, Teeger was necessarily aware of the sale to Roses at this point. Despite his knowledge of the ongoing sale to Roses, Teeger chose to represent that an auction was going to take place.

49.     There was never a planned auction for the Richardson Assets, and Barry relied on this misinformation to his detriment.

50.     At this point, Prairie, late on Friday afternoon on March 6, 2020, was actively pursuing Webster's performance of the ROFR, and seeking information about the purported auction.

51.     Specifically, at this time – what is now known in this case as the infamous "end-run" around Prairie's ROFR – on March 6, 2020, Prairie e-mailed Webster no less than three times reiterating its acceptance of the offer to purchase the Webster Interest.

52.     Prairie was ready, willing, and able to purchase the Webster Interest prior to March 9, 2020 – and accepted the offer and exercised the ROFR before that date.

53.     Prairie was also prepared to fund Richardson's operations going forward and had requested a weekly budget from Richardson. Indeed, from Prairie's perspective, funding the Richardson operations going forward was the natural consequence of purchasing Webster's 100% interest.

54.     Prairie and its affiliates had an undrawn line of credit of at least $10 million from Northern Trust and stood ready to fund whatever was needed.

55.     Webster ignored Prairie – as did the other parties to the March 9 Sale – and conducted the UCC private sale of the Richardson personal property and also the sale of real property far below market value instead of honoring the ROFR.

### D.  Instead of Honoring the Right of First Refusal, Webster, and Insiders Orchestrate an Asset Sale to Roses at the Behest of Afek

56.     As mentioned above, Prairie, through exercising the ROFR on March 4, 2020, already accepted the Webster offer under the ROFR or, alternatively, Prairie again exercised the ROFR on March 6, 2020, when it confirmed agreement to all terms of the draft Loan Assignment Agreement within the five-day option period. After that, Prairie stood ready to pay off Webster and close and followed up multiple times to close on acquiring the Webster Interest. Indeed, Prairie stood ready to preserve the value of Richardson the week prior to the March 9 Sale. But Afek had other plans.

57.     On March 9, 2020, Teeger and the Insiders agreed to sell Richardson's real estate to Roses for $200,000, which had a market value of several million dollars in excess of that amount.

58.     On or about March 9, 2020, Richardson purported to cease – but actually continued its business precisely as before under the Roses ownership. According to Afek and the other Insiders, management purported to surrender all of Richardson's assets, including the shares of RBC, to Webster pursuant to Section 9-610 of the UCC. This purported surrender was misdirected because by this time, Prairie had agreed to purchase 100% of Webster's Interest under the Webster Facility. However, Webster refused to close the ROFR Transaction with Prairie in breach of contract.

59.    Because Prairie accepted the OFFER on March 4, 2020, or on March 6, 2020, Webster had no rights to the collateral under Section 9-610 of the UCC. The Webster Interest under the UCC now belonged to Prairie. If anything, Afek and the other Insiders should have surrendered all of Richardson's assets to Prairie on March 9, 2020 – but they did not do so.

60.    In turn, Webster then purported to sell the Richardson Assets, which Webster did not have the right to own, to Roses on March 9, 2020.

61.    As stated above, Afek and Teeger purported to agree to surrender to Webster peaceful possession of substantially all of the Richardson Assets utilized in the operation of its business other than its real property located at 101 Erie Boulevard, Canajoharie, NY 13317, which was also sold to Roses for $200,000 in a separate but contemporaneous transaction that very same day.   The agreements that purported to surrender the Richardson Assets to Webster indicated the assets of both Richardson companies were sold as a combined lot and the agreements never identified which assets were held by which company.

62.    On March 9, 2020, Webster was paid by Roses all principal interest, fees, and legal expenses.

63.    Prior to the March 9 Sale, Founders, Teeger, Afek and Haber, acted in their own self-interest and authorized the surrender to Webster. They did so for their own reasons because they wanted their cash collateral repaid, and Afek wanted to gain employment with Roses, in addition to equity.

64.    In other words, Founders, Teeger, Afek and Haber acted in their own self-interest when they voted for the final sale and peaceful possession of Richardson, which, under the circumstances, constituted an *ultra vires* act.

### E.  Specific Allegations Surrounding the Purported Surrender and March 9 Sale

65.     On March 9, 2020, Richardson sent a letter to Webster, with the subject line "Re: Acknowledgment of Events of Default, Waiver of Notice, Consent, and Peaceful Possession Letter" (the "**March 9 Letter**"). Afek and Teeger, on behalf of Richardson, voluntarily agreed to the surrender of the Richardson Assets by Webster and also consented to Webster's simultaneous private sale of the Richardson Assets to Roses Holdings pursuant to UCC § 9-610.

66.     At this time, however, Prairie – not Webster – owned Webster's Interest in the loans and obligations that were the subject of the UCC § 9-610 transaction that is the subject of the March 9 Letter.

67.     By purporting to agree to the peaceful possession, a private UCC sale and the below market sale of the personal property and real estate, Afek and Teeger failed to act in Richardson's best interest. Indeed, these executives agreed to surrender the Richardson Assets to a bank that no longer had any interest in those assets under the UCC or otherwise.

68.     Afek and Teeger were not required to agree to the peaceful possession and the sale of the Richardson Assets or real estate. At the very least, for example, they could have required a public auction be held pursuant to the UCC, rather than a private sale to Roses Holdings, and disposed of the real estate in a similar manner. This is especially true here, in light of the pending offer by "Company C" – Pellicano Specialty Foods, Inc. – to purchase The Gravy Master business alone for $4.25 million, substantially more than the price Roses Holdings proposed paying for all of the Richardson Assets.

69.     After March 9, 2020, Roses Holdings acted as if it had acquired the Richardson Assets, free and clear of any creditor claims despite there being no foreclosure or public auction sale.

70.     Roses, however, knew of the ROFR, as well as Prairie's acceptance of Webster's offer to sell the Webster Interest, and therefore cannot be a good faith purchaser. Nonetheless, Roses transferred $3,402,871.00 to Webster and executed a Secured Party General Conveyance and Bill of Sale (the "**Bill of Sale**") dated March 9, 2020, with Webster.

71.     Roses also executed additional documents including a document entitled Purchase and Sale Agreement dated as of March 9, 2020. *See* **Exhibit I**.

72.     Again, such sale could not have been consummated at that time without the express permission of Prairie as the holder of 100% of Webster's Interest, including its mortgage on the factory in Canajoharie, New York.

73.     Upon execution of the Bill of Sale, Roses paid $2,410,871.86 of the purchase price to Webster.

74.     On or about March 9, 2020, Roses paid Founders $442,732 from the proceeds of the March 9 Sale of the Richardson Assets (the "**Founders Transfers**"). Founders was the controlling shareholder of Richardson. Further, the owners of Founders, Teeger and Haber, were paid $110,274.00 each.

75.     After March 9, 2020, Roses Holdings continued the same business operations as Richardson at the same location, with the same goodwill, Richardson customers, and the same management, personnel, equipment, and machinery.

76.     Prairie and its affiliates—cheated out of the ROFR—were still owed at least $2,336,397 as of March 9, 2020. Since then, the debt has grown with fees and interest to $4,914,445, less collections of $1,146,154.

**F.  Roses Holdings' Successor Liability**

77.     Plaintiff's position as alleged herein is that Roses, by their deeds and actions, have successor liability as the current continued operator of Richardson. Roses continued to operate the business in the same way as before. Roses paid antecedent debts of Richardson, both by honoring promotional credits and "bill backs" owed to former Richardson customers and paying other select vendors, continued the operation of the same business with the same people at the same location, and bought the assets at a bargain purchase price. In doing so, Roses assumed all prior Richardson liabilities, including Plaintiff's claims.

78.     On information and belief, in order to obtain two PPP loans from the US Small Business Administration, Roses necessarily had to admit and represent that Roses was a successor in interest to the business of Richardson. As a result, Roses merely continued the operations of Richardson as Richardson's successor.

79.     Webster was the lender for the first PPP loan, and Webster accepted all representations made by Roses. Webster *strangely* made a PPP loan to a company it previously controlled (as the assets were conveyed to it and Webster still controls the shares of RBC) and sold to Roses. Curiously, Webster did not process the second PPP loan that Roses obtained. Through government filings, written consents of RBC, and the deposition of Bret Meyers of Roses, it was revealed that Afek was gifted valuable equity in Roses. Afek continued to manage the Richardson business under its new name, Roses, although Roses continued to use the various Richardson brand names in the marketplace. Upon information and belief, the Richardson business has been profitable since the March 9 Sale.

80.     Roses' actions alleged herein resulted in: (i) a substantial continuity of Richardson's business operations; (ii) use by Roses of the plant and building used by Richardson; (iii) the rehiring of the same employees and workforce as Richardson; (iv) use of the same

supervisory personnel as Richardson, including Afek; (v) continuation of the same jobs and working conditions as Richardson; (vi) use of the same machinery, equipment, and methods of production as RBC; (vii) obtaining the PPP loans, and to do so, represented that they were a successor; (viii) the production and sale of the same products as Richardson; and (ix) the payment of promotional credits, bill backs and other vendor creditors for Richardson post March 9, 2020.

81.    Roses applied to the United States Small Business Administration ("**SBA**") for two PPP loans, one in May 2020 and the second in March 2021, totaling $1,128,703 and $1,130,335. The principal and interest ($2,259,038 in total) were ultimately forgiven based upon Roses' representations. In doing so, Roses used the historical payroll information of Richardson and assumed the liabilities that were ordinarily necessary for the uninterrupted continuation of Richardson's business.

82.    At this time, Roses was aware that (i) certain creditors and obligations of Richardson would not be paid, and that (ii) Richardson would be unable to pay all of its creditors.

83.    Roses hired Afek to continue as Chief Operating Officer of the successor company the Richardson – Roses Brands. Afek was also designated to represent Richardson in the bankruptcies. Plaintiff was harmed by Roses who, as purchaser of the Richardson Assets, assumed liability for the obligations of Richardson. Roses paid certain vendors and other creditors of Richardson but failed to do so in regard to Richardson's other creditors, particularly Plaintiff.

**G. The FRBP 2004 Nassau Candy Distributors Inc. Application**

84.    In the Chapter 7 case, on May 15, 2023, the Trustee filed an ex parte application for entry of an order, pursuant to FRBP 2004 (the "**Application**") directing another candy

company, Nassau Candy Distributors Inc., to produce certain documents and appear for examination by the Trustee's lawyers on behalf of Roses Holdings.

85.     The Trustee acted on behalf of Roses Holdings, successor of Richardson, for the sole benefit of Roses Holdings in order to seek discovery from Nassau Candy, while providing no proof that Nassau Candy used any confidential information to harm Richardson.  The Trustee for the bankruptcy estate of RFI purports to be the sole shareholder of all outstanding shares of RBC.

86.     Further, the Application claims that the letter of intent was only with RFI in order to buy the assets of RFI, including accounts receivables, inventory, etc. Indeed, the letter of intent clearly shows that Nassau Candy also thought that RFI owned all the Richardson Assets, as the letter was to purchase the receivables, inventory and "candy business" of RFI – not RBC.

87.     The Richardson books and Richardson's conduct presented RFI and RBC as operating as a single enterprise to Nassau Candy (and Plaintiff).

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(Breach of Contract Right of First Refusal – Prairie Against Defendant Webster)**

88.     Plaintiff repeats and realleges as if fully set forth herein the allegations in the preceding paragraphs of this Complaint.

89.     As stated above, in exchange for Prairie agreeing to deposit and pledge the $280,000.00 cash collateral with Webster, it was granted the ROFR to buy the Webster Facility, contained in Amendment No. 9 and the October Cash Collateral Agreement, which was agreed to by Webster, Founders and Richardson, when all parties executed the agreement and its amendments.  *See* **Exhibit H**.

90. Prairie fully performed its obligations under the Amendment No. 9 by agreeing to collateralize the Webster debt and depositing $280,000.00 with Webster Bank as cash collateral, conditioned on the ROFR.

91. Right up until the peaceful possession and the March 9 Sale, Prairie believed that the parties were working towards a deal to avoid a distressed UCC sale. This is further exacerbated by the fact that Webster and Prairie signed an NDA only days before the March 9 Sale.

92. Webster had peaceful possession of substantially all of Richardson's Assets, which allowed Webster to later sell them through a private sale to Roses Holdings. On March 9, 2020, Webster sold all of Richardson's Assets it possessed – with the possible exception of the RBC shares – in a private sale to Roses Holdings, except for the Canajoharie real estate which was sold at a bargain purchase price directly by Richardson to Roses. Webster violated both Amendment No. 9 and the October Case Collateral Agreement by denying Prairie its ROFR it had been granted in writing.

93. Despite the fact that Prairie had a contractual right to purchase the Webster Facility under Amendment No. 9, Webster refused to honor Prairie's ROFR.

94. Accordingly, Webster breached the ROFR by ignoring Prairie's exercise of the ROFR; acceptance of the offer expressed in the ROFR; and purchase of the Webster Interest. Instead, Webster initiated the sale to Roses Holdings.

95. Prairie has been damaged by Webster through the losses to itself and to its investors it brought into the Doge/Talcott Loans, in addition to damages to its reputation and substantial legal fees incurred. Furthermore, Prairie lost the corporate opportunity and revenue that Roses received from the Richardson business after March 9, 2020. As a result of the breach by Webster, Prairie was damaged in an amount to be determined at trial, but no less than $8,500,000.

## SECOND CLAIM FOR RELIEF
**(Breach of Contract of the Loan Assignment Agreement – Prairie Against Webster)**

96.     Plaintiff repeats and realleges as if fully set forth herein the allegations in the preceding paragraphs of this Complaint.

97.     Pursuant to the NDA, on the morning of March 5, 2020, Webster sent its ShareFile Attachments due diligence file to Prairie. Subsequently, Webster produced a draft "Loan Assignment Agreement" and sent it to Prairie.

98.     On March 4, 2020, Webster and Prairie entered into the NDA in connection with Prairie's acquisition of the Webster Facility which was secured by all of the Debtors' assets. Prairie believed that the parties were working towards a deal to avoid a distressed UCC sale.

99.     The Loan Assignment Agreement was marked-up and circulated by Webster shortly before the March 9 Sale, which memorialized Prairie's exercise of the ROFR and purchase of the Webster Facility.

100.     Prairie ACCEPTED the OFFER through exercising the ROFR on March 4, 2020, or alternatively, on March 6, 2020.

101.     Webster went "radio silent" and conducted the private sale instead, thus denying Prairie the benefits of its ROFR contained in Amendment No. 9 to Credit and Security Agreement of August 23, 2019, and the October Cash Collateral Agreement.

102.     As soon as Prairie accepted Webster's offer, Prairie was entitled to specific performance of the contract and turnover of the Richardson Assets. Instead, Webster finalized the deal with Roses and ignored Prairie, which was a breach of contract. Webster obviously was in talks with Roses at the same time as with Prairie, however, once they agreed to a deal and Prairie accepted Webster's offer, Webster continued talking to Roses. This constitutes a breach of the contract for which Prairie is entitled to specific performance.

22

103.    Webster breached as discussed above and, therefore, owes Prairie the value of Webster's Interest, less the purchase price Prairie agreed to pay.

104.    In addition, this breach further exacerbates the ROFR breach because Webster failed to respect Prairie's contractual ROFR.

105.    Prairie has been damaged by Webster through the losses of its investors it brought into the Doge/Talcott Loans, in addition to damages to its reputation and substantial legal fees incurred. Furthermore, Prairie lost the corporate opportunity and revenue that Roses received from the Richardson business after March 9, 2020. As a result of the breach by Webster, Prairie was damaged in an amount to be determined at trial, but no less than $8,500,000.

## THIRD CLAIM FOR RELIEF
### (Anticipatory Breach – Prairie Against Webster)

106.    Plaintiff repeats and realleges as if fully set forth herein the allegations in the preceding paragraphs of this Complaint.

107.    Prairie was ready and able to close and to purchase the Webster Facility. Prairie provided Webster with proof of financing, which was accepted by Webster, before sharing information and executing an NDA.

108.    Webster committed a voluntary affirmative act, by agreeing to the peaceful possession of the Richardson Assets in order to sell them to Roses, which rendered it unable to perform its obligations to Prairie under both the Amendment No. 9 and the October Cash Collateral Agreement. In addition, all cash collateral held by Webster to secure the debt will be surrendered to Webster. *See* **Exhibit H**.

109.    Webster's peaceful possession of the Richardson Assets and subsequent March 9 Sale to Roses constituted an anticipatory breach of the ROFR because it rendered Webster unable

to perform its obligation to Prairie under the Amendment No. 9 and the October Cash Collateral Agreement.

110.    Furthermore, Webster explicitly anticipatorily breached its contract with Prairie at least as early as February 26, 2020, when it ignored its obligations to Prairie under the ROFR and gave notice of its intent to dispose of the Richardson "Collateral" pledged to Webster and to which "Collateral" Prairie was subrogated. Webster's announcement of its intention not to honor the ROFR was unequivocal: "Please take notice that… Lender shall dispose of the Collateral, by one or more private sales on or after March 9, 2020…"  *See* Notification of Disposition of Collateral by Private Sale Under Section 9-610 of the Uniform Commercial Code dated February 26, 2020 (2019 in original) attached hereto as **Exhibit J**. Furthermore, such action was unnecessarily rushed by Webster to accommodate the desires of Afek and Roses to block Prairie's acquisition of the Webster Interest – the Forbearance Agreement between Richardson and Webster did not expire until March 31, 2020 – more than 3 weeks after the March 9 Sale. *See* **Exhibit J.**

111.    Prairie has been damaged by Webster through the losses of its investors it brought into the Doge/Talcott Loans, in addition to damages to its reputation and substantial legal fees incurred. Furthermore, Prairie lost the corporate opportunity and revenue that Roses received from the Richardson business after March 9, 2020. As a result of the breach, Prairie was damaged in an amount to be determined at trial, but no less than $8,500,000.

## FOURTH CLAIM FOR RELIEF
### (Breach of Covenant of Good Faith and Fair Dealing – Prairie Against Webster)

112.    Plaintiff repeats and realleges as if fully set forth herein the allegations in the preceding paragraphs of this Complaint.

113.    On August 23, 2019, Prairie signed and executed Amendment No. 9, along with Founders, Webster, and Richardson, which contained the ROFR.

114.    By conducting the March 9 Sale, Webster failed to comply with the terms of Amendment No. 9 and the October Cash Collateral Agreement, and effectively destroyed Prairie's right to receive the contract's fruits. Indeed, the implied covenant of good faith and fair dealing embraces the pledge that neither party shall do anything that will have the effect of destroying or injuring the other party's right to receive the benefits of the contract.

115.    Under the covenant of good faith and fair dealing, Webster was obligated to act in good faith and to not frustrate the purpose of the ROFR contract.

116.    Webster breached that duty by acting in bad faith and unfair dealing, by misrepresenting essential elements of the March 9 Sale to Prairie. Specifically, during the week prior to the March 9 Sale, Prairie attempted to purchase the Webster Interest several times, and was led to believe by Webster's own actions that this was going to happen. Instead, Prairie was kept in the dark of the planned peaceful transfer of the assets to it by Richardson and sale to Roses yet was told by Teeger that there would be an auction that Prairie could attend.

117.    Prairie has been damaged by Webster through the losses to it and its investors it brought into the Doge/Talcott Loans, in addition to damages to its reputation and substantial legal fees incurred. Furthermore, Prairie lost the corporate opportunity and revenue that Roses received from the Richardson business after March 9, 2020. As a result of the breach, Prairie was damaged in an amount to be determined at trial, but no less than $8,500,000.

**FIFTH CLAIM FOR RELIEF**
**(Breach of Covenant of Good Faith and Fair Dealing – Prairie Against Afek, Founders, Roses)**

118.    Plaintiff repeats and realleges as if fully set forth herein the allegations in the preceding paragraphs of this Complaint.

119.    On August 23, 2019, Prairie signed and executed Amendment No. 9, along with Founders, Webster, and Richardson. Amendment No. 9 specifies that Prairie benefits from a Right of First Refusal to purchase the Webster Facility.

120.    The Insiders breached the implied covenant of good faith and fair dealing by their acts, omissions, and breaches of Prairie's ROFR. Specifically, by conducting the March 9 Sale, Webster, Richardson, Afek and Founders failed to comply with the terms of Amendment No. 9, and effectively destroyed Prairie's right to receive the contract's fruits. Indeed, the implied covenant of good faith and fair dealing embraces the pledge that neither party shall do anything that will have the effect of destroying or injuring the other party's right to receive the benefits of the contract.

121.    Afek and Founders all owed Prairie a duty to act in good faith and conduct their affairs with fair dealing, as opposed to frustrating Prairie, which they did.

122.    Founders agreed and acknowledged the Amendment No. 9 agreement signed with Prairie in August 2019, as amended, and breached its covenant of good faith and fair dealing by frustrating Prairie's ROFR.

123.    Afek and Founders breached that duty by acting in bad faith and unfair dealing, by misrepresenting essential elements of the March 9 Sale to Prairie. Specifically, during the week prior to the March 9 Sale, Prairie attempted to purchase the Webster Interest several times, and was led to believe by Webster's own actions that this was going to happen. Instead, Prairie was kept in the dark of the planned peaceful transfer of the Richardson Assets to Webster and sale to Roses yet was told by Teeger that there would be an auction that Prairie could attend. At the same

26

time, Richardson and its Insiders had already made their choice of Roses to which Webster acquiesced and enthusiastically abetted.

124.    The breach of the covenant of good faith and fair dealing contained in Amendment No. 9 by Afek and Founders, jointly and separately, proximately caused damages to Prairie, in an amount to be determined at trial but no less than $8,500,000.

## SIXTH CLAIM FOR RELIEF
### (Declaratory Judgment – Prairie Against Roses)
### Successor Liability to Prairie
### 28 U.S.C. § 2201 et seq.

125.    Plaintiff repeats and realleges as if fully set forth herein the allegations in the preceding paragraphs of this Complaint.

126.    Based on the foregoing, Roses is a successor in liability to Richardson and, therefore, is liable to Prairie for its claims against Richardson.

127.    Roses was aware that as a result of the purchase of Richardson's assets certain creditors and obligations of Richardson would not be paid, and that Richardson would be unable to provide relief and pay its creditors. The March 9 Sale was a de facto merger, and Roses is a mere continuation of Richardson.

128.    For example, Roses carefully selected the Richardson liabilities it would assume while claiming it purchased only the assets. Indeed, upon purchase of Richardson, Roses took over the same business, in the same factory, with the same people, and paid off pending debt. Afek reprised his role within Roses and received valuable equity in Roses. In fact, Roses represented to the SBA that it was in operation on February 15, 2020, and had employees it paid salaries and payroll taxes or paid independent contractors, as reported on Form 1099-MISC. Roses was not in

operation until March 9, 2020, and, thus, represented to the SBA that it was a mere continuation of the Richardson business.

129.    After the purchases by Roses Holdings, Richardson's operations continued as before, employing the same personnel and management as before, as well as the same offices and machinery. Roses continued the production and sale of the same products as Richardson using the same brand names and trademarks.

130.    Further evidence that Roses was a mere continuation of the Richardson operations is that Roses applied for two PPP loans in May 2020 and March 2021, and in doing so used the historical payroll information of Richardson and assumed many liabilities that were ordinarily necessary for the uninterrupted continuation of Richardson's business.

131.    Prairie respectfully requests that this Court declare that Roses is the successor to Richardson, and as such has successor liability to Prairie in the amount of no less than $8,500,000.00.

## SEVENTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty – Prairie Against Defendants Founders, Afek, & Teeger)

132.    Plaintiff repeats and realleges as if fully set forth herein the allegations in the preceding paragraphs of this Complaint.

133.    Afek, Teeger, and Founders owed a fiduciary duty to Richardson as directors and officers of Richardson. *See* Trustee Complaint (ECF No. 1; Adv. Pro 22-01103-JPM).  Afek and Teeger breached the fiduciary duty they owed to Plaintiff, as creditor of Richardson.

134.    Upon information and belief, from January 1, 2020, Richardson was insolvent, since it was unable to pay its debts and meet its contractual obligations.

135.    Upon information and belief, Richardson was substantially undercapitalized throughout its operations, which contributed to its inability to meet financial obligations, and ultimately led to its failure to satisfy contractual commitments and obligations.

136.    Afek was the President and CEO of RBC and RFI, and as such owed fiduciary duties to Richardson which included, among others, the duties of care and loyalty, and to act in good faith. This involved the duty to act solely in the interest of Richardson and their creditors, and not to act in his own personal interests.

137.    Teeger was Chairman of the Board of RFI and Haber was an informed board member of RFI and leader of Founders. As such, Teeger and Haber owed fiduciary duties to Richardson, which included, among others, the duties of care and loyalty, and to act in good faith. As with Afek, this involved the duty to act solely in the interest of Richardson and their creditors, and not to act in their own personal interests.

138.    As such, Afek and Teeger owed fiduciary duties to Prairie, which included, among others, the duties of care and loyalty, and to act in good faith. Those duties involved the duty to act solely in the interest of Richardson and their creditors, including Prairie, and not to act in their own personal interests. As owner of Richardson, Founders owed a fiduciary duty to the Plaintiff.

139.    Among other things, this fiduciary duty required that Richardson assets be preserved for the benefit of the entire corporate enterprise, and that all material information regarding Richardson and their financial affairs be fully and fairly disclosed to their creditors. In violation of the fiduciary duties owed to the Plaintiff, Afek and Teeger caused the enormous potential liabilities facing Richardson to be concealed and/or misrepresented.

140.    In neglecting their fiduciary, contractual, and/or common law duties to the Plaintiff, Afek and Teeger misrepresented the financial health of Richardson, creating the false appearance

of solvency despite its evident cash flow insolvency, which obligated them to act in the best interests of Prairie, rather than prioritizing their personal interests.

141.    Afek knowingly breached this duty by prioritizing his own personal interests over those of RBC and RFI. In doing so, Afek acted fraudulently to secure his next job.

142.    Indeed, Afek falsely represented that he would act in good faith and solely in the interest of Richardson as the President and CEO of RBC and RFI. Afek knew, at the time of the misrepresentation, that he was acting solely in his personal interest in order to keep his position as an officer and director of Richardson and secure his new job at Roses. Afek was aware that the March 9 Sale to Roses was not in the best interest of Richardson because other offers made before the March 9 Sale were more beneficial and profitable for Richardson and their Creditors. Afek intentionally deceived Richardson, and as a result, the Creditors, in his own interest. Prairie justifiably relied on the misrepresentation.

143.    As a consequence, Plaintiff suffered damages that were proximately caused by the false representation.

144.    Teeger also falsely represented that he would act in good faith and solely in the interest of Richardson as the Chairman of the Board of RFI.  Teeger knew, at the time of the misrepresentation, that he was acting solely in his personal interest in order to keep his cash collateral loan. Teeger was aware that the March 9 Sale to Roses was not in the best interest of Richardson because other offers made before the March 9 Sale were more beneficial and profitable for Richardson and their Creditors. Teeger intentionally deceived Richardson, and as a result, the Creditors, in his own interest. Prairie justifiably relied on the misrepresentation. As a consequence, Prairie suffered damages that were proximately caused by the false representation.

145.    Afek wanted to sell Richardson as one company in order to benefit from continued employment from the purchaser. Afek acted in his own interest to sell the Richardson assets, which violated the fiduciary duties he owed to Richardson, most particularly his duties of care, loyalty, and good faith.

146.    Teeger knowingly breached this duty by prioritizing his own personal interests over those of RFI, by agreeing to sell the Richardson assets at a lower price in order to receive proceeds from the sale at the expense of the creditors.

147.    Despite the fact that Afek and Teeger had received letters of intent from prospective buyers to purchase Gravy Master as a standalone company, for $3,700,000 and $4,250,000, and the Candy Business for $2,000,000, excluding the real estate, Afek and Teeger were insistent on selling only to Roses Holdings.

148.    In fact, Prairie offered to manage Richardson because it believed it could liquidate the assets and return $10 million, which is one reason why Prairie stepped up to purchase the Webster Facility.

149.    As an insider, Afek even communicated to Roses that Prairie was intending to purchase the loans, which rushed the March 9 UCC sale. By acting in his own interest, Afek breached the fiduciary duty he owed to Richardson.

150.    On March 9, 2020, Teeger and Afek signed over peaceful possession of the Richardson Assets to Webster, which then sold the Richardson Assets to Roses on that same day. Teeger and Afek gave Webster the right to sell the Richardson' Assets for no cash consideration to the Richardson.

151.    As the owners of Richardson, Founders had an interest in selling the Richardson Assets to Roses, and in doing so, aided, and abetted in the March 9 Sale at the expense of its

31

creditor, Prairie. Founders aided Afek, Teeger, and Haber in the breach of their fiduciary duties because it would profit from the March 9 Sale by receiving proceeds to the detriment of all other creditors.

152.    Roses acquired the Richardson Assets other than the real property pursuant to a private sale under UCC §9-610, for a purchase price of $3,402,871.86. In the week prior to the March 9, 2020, Sale, Prairie was aggressively trying to acquire the Webster debt to preserve more value.

153.    In comparison, Richardson's Assets could have sold for up to $10,000,000 based upon Gravy Master's contribution. The Richardson Assets should have been sold to the highest bidder. Instead, Afek, Teeger and Haber gave Webster the right to sell the Richardson Assets without considering the Richardson' interests. By agreeing to the peaceful possession and a private UCC sale, Afek, Teeger and Haber failed to act in Richardson's best interest and caused harm to Richardson. This is further evidenced by the agreement wrongly naming Prairie in place of Doge in numerous locations.

154.    As a phantom equity stakeholder and officer in Richardson, Afek had a responsibility to secure the most for the secured and unsecured creditors – not to pave the way for his next job.

155.    Afek continued to misrepresent the facts as his role as the representative for both RFI and RBC during their respective bankruptcy proceedings. He filed incorrect schedules and financial statements not properly disclosing a $16 million debt from RBC to RFI, debts of Doge and Talcott and misrepresenting the fact that many unsecured creditors as of March 9, 2020, were subsequently paid by Roses.

156.    Accordingly, Afek and Teeger breached their fiduciary duties towards Richardson and the Plaintiff.

157.    Accordingly, as a result of the March 9 Sale to Roses Holdings for less than reasonably equivalent value the sale constituted a breach of the fiduciary duty owed to Prairie, it is entitled to judgment against Afek and Teeger in an amount to be determined at trial, but no less than $8,500,000.00.

**EIGHTH CLAIM FOR RELIEF**
**(Negligent Misrepresentation – Prairie Against Teeger)**

158.    Plaintiff repeats and realleges as if fully set forth herein the allegations in the preceding paragraphs of this Complaint.

159.    On or around March 2, 2020, Teeger misrepresented to Prairie that the sale of the Richardson assets was going to take place through a public auction.

160.    No such auction was planned or took place, and the Richardson Assets were sold to Roses in private sale instead, on March 9, 2020.

161.    Teeger was a corporate officer of Richardson, as Chairman of the Board of RFI. By misrepresenting to Prairie that an auction was going to take place, Teeger acted in his own self-interest.  As corporate officer of Richardson, Teeger was aware of the Richardson Assets and how they were going to be sold to Roses.

162.    As a result of Teeger's misrepresentation, Barry, on behalf of Prairie, sought the location of the auction in an attempt to make a bid to stop the undisclosed private sale to Roses.

163.    Prairie justifiably relied on the misrepresentation. Therefore, Prairie suffered damages that were proximately caused by the false representation. Defendants' depredations have

caused damages, including $1.8 million in legal fees and interest, which are the direct consequence of the bad acts. Plaintiff was injured in no less than $1.8 million.

164.    Further, Teeger misrepresented to Prairie that an auction was going to take place, despite the fact that there was no auction.

165.    Therefore, Prairie is entitled to judgment against Teeger for negligent misrepresentation in an amount to be determined at trial but no less than $8,500,000.

## NINTH CLAIM FOR RELIEF
### (Declaratory Judgment Turnover of the RBC Shares – Prairie Against Webster)

166.    Webster holds all of the "RBC Capital Stock" pursuant to the Subsidiary Pledge Agreement dated as of December 24, 2014 (the "**Pledge Agreement**"). Plaintiff submits that Webster has no rights or interest in the RBC Capital Stock. The RBC Capital Stock together with its attached blank stock power should be turned over to the Court for administration.

167.    Plaintiff repeats and realleges as if fully set forth herein the allegations in the preceding paragraphs of this Complaint.

168.    An actual and justiciable controversy now exists between the Parties regarding the status of the 2014 Pledge Agreement, as the events outlined above demonstrate.

169.    Plaintiff is entitled to a declaratory judgment directing Webster to turn over the RBC shares.

170.    Plaintiff is entitled to a declaratory judgment stating that Webster has no interest, right, or claim in the RBC Capital Stock and that the RBC Capital Stock should be returned to the Plaintiff or administered by the Court.

## JURY DEMAND

171.    Plaintiff respectfully demands a trial by jury on all issues so triable.

34

<u>**REQUEST FOR RELIEF**</u>

**WHEREFORE**, Plaintiff respectfully requests the entry of a judgment:

(1) awarding damages to Prairie in the amount of $8,500,000 plus legal fees with respect to Counts 1-9;

(2) awarding damages to Prairie in an amount to be proven at trial, plus interest, with respect to Counts 2–8;

(3) declaring on Count 9 that Webster has no right to hold the RBC shares;

(6) awarding all direct out-of-pocket losses, attorneys' fees, and costs to Plaintiff; and

(7) granting such other and further relief as this Court may deem just and proper.


Dated: New York, New York
        January 3, 2025

                              Respectfully submitted,

                              **DUNNINGTON, BARTHOLOW & MILLER LLP**

                              By: _/s/Luke McGrath_____
                              Luke McGrath, Esq.
                              230 Park Avenue, 21st Fl.
                              New York, New York 10169
                              Tel. (212) 682-8811
                              lmcgrath@dunnington.com

                              *Counsel to Prairie Street Capital Inc. as Plaintiff*