UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PRAIRIE STREET CAPITAL, INC.,

                     Plaintiff,

               – *against* –

KOBI AFEK; FOUNDERS EQUITY I,
LP; JOHN TEEGER; ROSES
CONFECTIONS, LP; ROSES RE
HOLDINGS, LLC; WEBSTER
BUSINESS CREDIT CORPORATION;
SUELLEN HABER AS EXECUTOR OF
WARREN HABER'S ESTATE; *and*
SBHC LLC;

                     Defendants.

**OPINION & ORDER**

25-cv-00086 (ER)

RAMOS, D.J.:

Prairie Street Capital, Inc. ("Prairie") brought suit against Kobi Afek; Founders Equity I, LP ("Founders"); John Teeger; Roses Confections, LP; Roses RE Holdings, LLC; SBHC LLC (collectively with Roses Confections, LP and SBHC LLC, "Roses"); Webster Business Credit Corporation ("Webster"); and Suellen Haber as the executor of the estate of Warren Haber ("Haber")[1] pursuant to the Court's diversity jurisdiction.  Doc. 64.  Pending before the Court are three motions to dismiss the amended complaint.  *See* Docs. 77, 82, 90.  For the reasons set forth below, the motions are GRANTED and the amended complaint is DISMISSED.

## I.    BACKGROUND[2]

Richardson Brands Company ("RBC") was a manufacturer of candy and gravy products.  Doc. 64 ¶ 13.  In January 2006, Founders formed Richardson Foods, Inc. ("RFI", and together with RBC, "Richardson") to purchase RBC.  Doc. 64 ¶ 13.  Afek,

---

[1]  Haber passed away on March 20, 2024.  Doc. 64 ¶ 8.

[2]  The background is drawn from factual allegations in the amended complaint, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and the documents incorporated therein, *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).  The Court accepts all well-pleaded factual allegations as true.  *Id.*

Teeger, and Haber were all members of the boards of RFI and RBC. *Id.* ¶¶ 5, 7, 8. Afek also served as president and CEO of the two companies. *Id.* ¶ 5. Teeger and Haber were also principals of Founders. *Id.* ¶¶ 7, 8.

The dispute in this case arises out of two agreements pertaining to a $5 million loan that Richardson received from Webster in December 2014. The first agreement, known as the "Webster Facility," established the terms of the loan. *Id.* ¶ 15. To secure the loan, the Webster Facility granted Webster a "continuing security interest in and to all of [Richardson's] Collateral," Doc. 78-1 at 23, which the Webster Facility defined as "all assets of" Richardson, *id.* at 83. If Richardson defaulted on the loan, the Webster Facility also entitled Webster to certain "rights and remedies" under the Uniform Commercial Code. *Id.* at 63–64. These included "the right to foreclose [on its] security interests" and "to take possession of and sell any or all of the Collateral with or without judicial process." *Id.*

Approximately three years after Webster and Richardson entered into the Webster Facility, Founders sought funding for Richardson. *Id.* ¶ 16. In response to Founders's request for assistance, Prairie enlisted two investors to provide an additional loan to Richardson of $1 million on February 5, 2018. *Id.* ¶ 16 & n.9. Richardson, however, continued to struggle to meet its obligations under the Webster Facility, and, sometime before September 28, 2018, defaulted on the Webster Facility.[3] Doc. 64-5 at 2. To prevent Webster from reducing Richardson's credit limit under the Webster Facility, on April 15, 2019, Founders, Teeger, and Haber deposited $380,000 of additional cash collateral with Webster Bank and pledged this collateral as security under the Webster Facility. Doc. 64 ¶¶ 17, 18; Doc. 64-2 ¶ 1. Webster requested additional cash collateral,

---

[3] In a Forbearance Agreement dated September 28, 2018, Webster agreed to temporarily forbear on its "default-related rights and remedies against [Richardson]" with respect to certain defaults. Doc. 64-5 at 2. The Forbearance Agreement is described in two subsequent agreements that Prairie attached to the amended complaint. *See id.*; Doc. 64-12 at 2.

however, and a few months later, in August 2019, Prairie agreed to provide an additional cash deposit to Webster of $280,000.  Doc. 64 ¶ 19.

That same month, Webster, Richardson, Founders, and Prairie entered into the second agreement that underlies the dispute in this case:  an amendment to the Webster Facility, which the parties refer to as "Amendment No. 9."  *Id.* ¶ 29.  Pursuant to Amendment No. 9, Webster, Richardson, and Founders agreed to give Prairie a right of first refusal that entitled Prairie to purchase 100% of Webster's interest in the Webster Facility (the "Webster Interest").  *Id.*  Amendment No. 9 specifically provided:

> (f) <u>Right of First Refusal</u>.  [Webster] may participate or otherwise sell, assign or transfer any or all of its right, title, and interest in and to the [Webster Facility] to any third person at any time; provided, however, that *to the extent such sale constitutes 100% of [Webster's] interests in the [Webster Facility] (a "<u>Qualified Loan Sale</u>"), [Webster] shall first offer to Prairie Street Capital, Inc., a Delaware corporation and pledger of certain cash collateral in support of [Richardson's] Obligations under the [Webster Facility], a right of first refusal to purchase its interest so offered for Qualified Loan Sale*.  In the event that [Webster] offers any such right of first refusal to [Prairie], [Prairie] shall promptly accept or reject such right of first refusal, but in any event within five (5) Business Days after receipt of such offer notice (the "<u>Option Period</u>").  If the offer is accepted prior to the expiration of the Option Period, the parties shall promptly close the purchase of [Webster's] right, title, and interest so offered to [Prairie], and in any event within five (5) Business Days of the written offer thereof by [Webster] to [Prairie], failing which [Webster] shall be free to consummate such Qualified Loan Sale to any such third person without restriction. . . .  This Section 16.3(f) and the right of first refusal provided herein shall terminate on the date [Prairie] ceases to be a guarantor or obligor of the Obligations or challenges or terminates any guaranty or pledge agreement made by [Prairie] in support of the Obligations.

Doc. 64-10 at 2–3 (emphasis added).

Approximately six months after this amendment, Roses sent Afek, in his capacity as President of RFI, a letter of intent in which it offered to buy "substantially all of [RFI's] assets."  Doc. 64-3 at 1–2.  Richardson forwarded the letter of intent to Webster, as required under the Webster Facility.  Doc. 64 ¶ 35.

3

Upon receipt of the letter of intent, Webster caused Richardson to reject the offer and on February 25, 2020, convinced Roses to send a new proposal directly to Webster. *Id.* ¶¶ 36–38.   Webster allegedly orchestrated this new proposal because it wanted to avoid triggering Prairie's right of first refusal.  *Id.* ¶ 40.  In the second letter of intent, which was addressed to Webster, Roses proposed to purchase "substantially all of the assets of [Richardson's] food manufacturing business" from Webster and Richardson. Doc. 64-4 at 2.  Specifically, the letter contemplated Webster's sale "of all of the Collateral, as such term is defined in [the Webster Facility] . . . that is comprised of personal property assets" via a "UCC Sale pursuant to Section 9-611 of the New York Uniform Commercial Code."  *Id.*

Prairie alleges that, notwithstanding Webster's efforts to avoid triggering Prairie's right of first refusal pursuant to Amendment No. 9, both letters of intent "clearly" did so. Doc. 64 ¶ 41.  Based on this understanding, Prairie informed Afek that it would purchase the Webster Facility on March 3, 2020, and shared the same information with Webster the next day.  Doc. 64 ¶¶ 52, 54.  Webster then entered into a non-disclosure and confidentiality agreement ("NDA") with Prairie, after which it sent its due diligence files to Prairie.  *Id.* ¶¶ 54, 58.  The next day, Webster's lawyers also sent Prairie a draft "Loan Assignment Agreement," which included a blank space in place of the purchase price.  *Id.* ¶¶ 55, 59.  Prairie requested that Webster insert the sales price that had triggered the right of first refusal into the Loan Assignment Agreement.  *Id.* ¶ 60.

On March 6, 2020, Teeger told Prairie's president, Michael Barry, that Richardson's assets were going to be sold at auction the following week.  *Id.* ¶ 67.  The same day, Prairie also sent Webster several emails indicating that it wanted to finalize the Loan Assignment Agreement and complete the purchase.  Doc. 64-9.[4]

---

[4]  The amended complaint alleges that, in these emails, "Prairie agreed to all the terms expressed in the draft Loan Assignment Agreement," and thus "complet[ed]" the sale of the Webster Facility [Loan] to Prairie." Doc. 64 ¶ 56.  But the emails, which Prairie appends to the amended complaint, plainly indicate that Prairie

Three days later, Richardson acknowledged that it had previously defaulted under the Webster Facility and consented to Webster's "exercise of all rights of possession in and to th[e] Collateral consistent with the [Webster Facility]" and UCC, including, Webster's "private sale to Roses Holding Limited . . . pursuant to UCC § 9-610 . . . of [its] right, title and interest in the Personal Property Collateral" for approximately $3.4 million and a percentage of certain accounts receivable included in the collateral sold. Doc. 64-5 at 3. Richardson's acknowledgement and consent were memorialized in an Acknowledgement of Events of Default, Waiver of Notice, Consent and Peaceful Possession Letter (the "Surrender Agreement") with Webster. Doc. 64 ¶¶ 78, 79, 85, 86, 91. The Surrender Agreement noted that Founders, Teeger, Haber, and Prairie were "Subrogated Creditors" relative to Webster. Doc. 64-5 at 2. It also distributed approximately $2.5 million of the $3.4 million to Webster—in full satisfaction of the principal, interest, and fees Richardson owed Webster—before distributing the remainder to the Subrogated Creditors on a *pro rata* and *pari passu* basis. *Id.* at 9. Prairie received $228,717.95 as part of this distribution. *Id.*; *see also* Doc. 64 ¶¶ 82, 91, 92, 94.

In Prairie's view, the surrender and sale were "sham" transactions, because Prairie had already exercised its right of first refusal pursuant to Amendment No. 9, purchased the Webster Interest, and assumed Webster's status as lender under the Webster Facility. Doc. 64 ¶¶ 63–65. Thus, Prairie argues that only Prairie "could have acted to accept a peaceful surrender" of Richardson's assets, and that in purchasing Richardson's assets

merely expressed its desire to purchase the loans and finalize the Loan Assignment Agreement. *See* Doc. 64-9 at 2 ("[W]e're willing to buy the loan."); *id.* at 3 ("We want to buy the loan, but the pace seems a bit slow."); *id.* at 4 ("We have [sic] want to buy the loan but need to hear back from the bank as to the next steps. Our lawyers are speaking to your lawyers to get the agreements filled out, so the ball is in your court."); *id.* ("[S]ince you told us to buy the loan we stand ready to do so. But if we could have a call to confirm the course of action we would be appreciative."); *id.* at 5 ("As bankers you [k]now the wire cut off time is fast approaching, and we still don't have [t]he final docs from you to purchase the loan. Please call or e-mail us as to what is going on."); *id.* at 6 ("Prairie Street has offered to purchase the Webster loans at par but needs to know the payoff amount which we have been requesting for a few days. We hope the Assignment Agreement can be finalized . . . ."). Because the attached emails contradict the allegations in the complaint, the Court need not accept these allegations as true. *See L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011).

5

from Webster, "Roses took from Webster what Webster did not own." *Id.* ¶¶ 63, 65. Prairie argues that Afek, Founders, Teeger, and Haber authorized this "sham" surrender out of self-interest:  Prairie alleges that they wanted their cash collateral repaid. *Id.* ¶ 83. Prairie also alleges that Afek agreed to the Surrender Agreement because he wanted to be employed by and receive equity from Roses. *Id.*

## II.    PROCEDURAL HISTORY

Prairie filed the instant suit on January 3, 2025.  Doc. 1.  Webster and Roses then moved to dismiss the complaint, Doc. 51, 57, and Prairie amended its complaint on March 21, 2025, Doc. 64.  The amended complaint asserts the following claims for relief: (1) breach of contract of the right of first refusal (against Webster), (2) breach of contract of the offer and acceptance (against Webster), (3) anticipatory breach (against Webster), (4) breach of the covenant of good faith and fair dealing (against Webster), (5) breach of the covenant of good faith and fair dealing (against Afek, Founders, Haber, and Roses) (6) successor liability (against Roses), (7) breach of fiduciary duty (against Afek, Founders, and Teeger), (8) negligent misrepresentation (against Teeger), (9) constructive trust (against Roses), (10) accounting (against Roses), and (11) unjust enrichment (against Roses).  *Id.* ¶¶ 114–212.

The defendants moved to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) via three separate motions:  Webster moved to dismiss the amended complaint on May 1, 2025, Doc. 77; Roses moved to dismiss on May 15, 2025, Doc. 82; and Afek, Founders, Teeger, and Haber (the "Founders Defendants") moved to dismiss on May 23, 2025, Doc. 90.  All three motions are fully briefed.

## III.    LEGAL STANDARD

Under Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See Koch v.*

*Christie's International PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  The Court is not required, however, to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  In resolving a 12(b)(6) motion, a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).  Factual allegations that are contradicted by documentary evidence attached to the complaint or incorporated by reference therein are not entitled to the presumption of truth.  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011).

Because the Court is sitting in diversity, it must apply state substantive law. *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427 (1996).  "The parties' briefs assume that New York substantive law governs the issues . . . presented here, and such implied consent is, of course, sufficient to establish the applicable choice of law."  *Arch Insurance Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009) (quoting *Golden Pacific Bancorp v. FDIC*, 273 F.3d 509, 514 n.4 (2d Cir.2001)).  The Court therefore applies New York substantive law.

## IV.    DISCUSSION

### A.  Breach of Contract of the Right of First Refusal (Count One)

Count One alleges that Webster breached Amendment No. 9 when it "ignor[ed]" Prairie's acceptance of its right of first refusal to "purchase" the Webster Interest and instead conducted a "sham sale" of Richardson's assets to Roses.  Doc. 64 ¶ 120.

7

Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Fischer & Mandell, LLP v. Citibank N.A.*, 632 F.3d 793, 799 (2d Cir. 2011).

Webster argues that Prairie has failed to state a claim based on the right of first refusal provision because it has failed to plausibly allege a breach. Doc. 79 at 10. It contends that the offer to sell Richardson's assets was merely an exercise of its right pursuant to the Webster Facility to sell Richardson's Collateral upon default. *Id.* at 12–13. And it argues that, based on the face of the Webster Facility and Amendment No. 9, a collateral sale does not trigger Prairie's right of first refusal. *Id.* at 11.

The Court agrees that Prairie has not plausibly alleged that Webster breached the right of first refusal provision. As Webster notes, the plain language of Amendment No. 9 states that Prairie's right of first refusal is triggered by Webster's offer to sell 100% of its loan rights: it provides that prior to any "sale [that] constitutes 100% of [Webster's] interests in the [Webster Facility] (a 'Qualified Loan Sale')," Webster is required to "first offer" to Prairie "a right of first refusal to purchase its interest so offered for Qualified Loan Sale." Doc. 64-10 at 1. But the second letter of intent[5]—which Prairie attached to the amended complaint, Doc. 64-4—makes clear that Webster offered only to sell Richardson's *assets* as collateral pursuant to Article 9 of the UCC, which it was entitled to do upon default under the plain terms of the Webster Facility. *See* Doc. 78-1 at 63–64 (explaining that, upon default, Webster was entitled to, *inter alia*, "take possession of and sell any or all of the Collateral with or without judicial process" "under the Uniform Commercial Code"). And, in New York, "[r]ights of first refusal are construed narrowly." *Lewis v. Rahman*, 147 F. Supp. 2d 225, 236 (S.D.N.Y. 2001). Thus, while Prairie had a right to prevent Webster from selling 100% of its interest in the Webster Facility to a third party, it plainly did not have a right to prevent Webster from exercising its rights under

---

[5] The first letter of intent was directed toward Afek at RFI, not Webster; thus, it is not plausible that it could substantively represent an offer to purchase Webster's loan interests.

that same loan agreement, including its right to sell Richardson's Collateral upon default. Prairie's allegation that Webster's sale of Richardson's assets triggered the right of first refusal is therefore not plausible.[6]

In resisting this conclusion, Prairie emphasizes that the substance—rather than the label—of the transaction controls under New York law.  Doc. 88 at 5.  And it contends that, here, it has plausibly alleged that "the Roses Offers and the resulting transaction in substance meet[] the definition of a Qualified Loan Sale."  *Id.*  But even assuming that substance controls under New York law, Prairie has not plausibly alleged that either of offers made by Roses contemplated a transaction that, in substance, was a Qualified Loan Sale.  As the Court has explained, neither of Roses' letters of intent contemplate the sale of—or even reference—100% of Webster's interests in the Webster Facility.  And the second letter of intent describes a sale that, in substance, conforms with a collateral sale pursuant to Article 9 of the UCC.  Indeed, it explicitly describes the transaction as representing a "UCC Sale" of "Collateral."  Doc. 64-4 at 2.  It further states that Roses "will acquire substantially all of the Personal Property Assets . . . free and clear of all rights, security interests, and liens to the extent set forth in Section 9-617 of the New York Uniform Commercial Code" and requires that Webster provide "notice of the UCC Sale pursuant to Section 9-611 of the New York Uniform Commercial Code."  *Id.*  And the Surrender Agreement, which Prairie also appends to the amended complaint, also describes the transaction as a "private sale to Roses Holding Limited . . . pursuant to UCC § 9-610 . . . of [Richardson's] right, title and interest in the Personal Property Collateral" and distributes the purchase price "consistent with the priorities set forth in UCC § 9-615(a)."  Doc. 64-5 at 3–4.  Because Prairie does not identify any contrary

---

[6]  Indeed, in March 6, 2020 emails that Prairie attaches to the amended complaint, Prairie itself makes this distinction:  while it refers to Webster's "recent agreements to sell assets via a UCC sale" and Webster's "sale of its collateral," it notes that "Prairie Street is prepared to buy out the senior loans" and "has offered to purchase the Webster loans."  Doc. 64-9 at 9.

factual allegations, its contention that "the Roses Offers and the resulting transaction in substance meet[] the definition of a Qualified Loan Sale" is not plausible.[7]  Doc. 88 at 5.

In sum, Prairie has not plausibly alleged that Webster offered to engage in a Qualified Loan Sale, which would trigger Prairie's right of first refusal.  Thus, it has not stated a claim that Webster breached Amendment No. 9 when it "ignore[d]" Prairie's attempt to exercise that right.  Count One is therefore dismissed.

### B.  Breach of Contract of Prairie's Acceptance of Roses' Offer (Count Two)

In Count Two, Prairie alleges that it formed a contract with Webster "under the same terms as the Roses offer" when it accepted Webster's offer to exercise the right of first refusal on either March 4, 2020, or March 6, 2020.  Doc. 64 ¶ 123–26.   And it contends that Webster breached this contract when it sold Richardson's assets to Roses.  Doc. 64 ¶ 127.

 "To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound."  *Peterson v. Regina*, 935 F. Supp. 2d 628, 635 (S.D.N.Y. 2013) (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004)).  "The existence of a contract," moreover, "may be established through conduct of the parties recognizing the contract."  *Apex Oil Co. v. Vanguard Oil & Service Co. Inc.*, 760 F.2d 417, 422 (2d Cir. 1985).

Webster contends that Prairie has failed to state a contract claim because the amended complaint "is devoid of any allegations regarding any offer or acceptance between the parties and does not define the terms of a purported agreement."  Doc. 79 at

---

[7]  Prairie also argues that "whether or not the sale qualified under the [right of first refusal]" is an "issue of fact" that cannot be decided on a motion to dismiss.  Doc. 88 at 7.  But that conclusory assertion—offered without citation to any supporting authority—misunderstands the Rule 12(b)(6) inquiry.  In ruling on Webster's motion, the Court must consider whether the facts in the complaint and the documents incorporated therein raise a plausible inference that Webster breached the right of first refusal provision.  That does not transform the inquiry into a factual question improperly resolved on a motion to dismiss.  *See L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011) ("Plausibility . . . depends on a host of considerations:  the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable.").

13.  In response, Prairie asserts that the conduct alleged in the amended complaint "confirms and reinforces the existence of a contractual relationship to purchase Webster's interests."  Doc. 88 at 7–8, 9.  Prairie highlights, in particular, its allegations that:  (1) Webster "circulated" and "marked up" the Loan Assignment Agreement, (2) Webster and Prairie entered into the NDA, and (3) Prairie's president and counsel sent emails to Webster regarding the draft Loan Assignment Agreement.[8]  Doc. 64 ¶¶ 64, 123–25; *see* Doc. 88 at 8–16.

The Court concludes that these allegations do not plausibly suggest that Webster offered Prairie the right of first refusal or that Prairie accepted the offer and thus contracted to purchase the Webster's interest in the Webster Facility.  For one, the "language of the [Loan Assignment] Agreement makes clear that [Webster] did not intend to be bound until the Agreement was executed."  *National Gear & Piston, Inc. v. Cummins Power Systems, LLC*, 861 F. Supp. 2d 344, 358 (S.D.N.Y. 2012).  Indeed, the Loan Assignment Agreement includes a merger clause stating that it "shall constitute the entire and whole agreement between the parties."  Doc. 64-8 at 5.  And before the signature line—which was not executed by either party—it states, "IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective duly authorized officers on the date set forth above."  *Id.* at 7.  Thus, as in *National Gear & Piston*, "these provisions all demonstrate a clear intent to be bound only once the Agreement was signed by both [p]arties."  861 F. Supp. 2d at 357.  Because the Loan Assignment was not executed, the Court cannot say that it supports a plausible inference that the parties understood that they were bound to an agreement regarding the right of first refusal.  *Id.* at 359 (explaining that "contract may not be implied in fact from the

---

[8]  In its opposition to the motion to dismiss, Prairie also highlights the allegations that Prairie "exercise[ed] the [right of first refusal]," "accept[ed] the offer," and "purchas[ed] the Webster Facility."  *See e.g.*, Doc. 88 at 7–8, 15.  But these are legal conclusions, not factual allegations, and thus not entitled to the presumption of truth.  *L-7 Designs*, 647 F.3d at 430.

conduct of the parties where it appears that they intended to be bound only by a formal written agreement" (quoting *Valentino v. Davis,* 270 A.D.2d 635, 638 (3d Dep't 2000))).[9]

Nor do Prairie's allegations regarding the NDA and emails exchanged with Webster plausibly suggest otherwise. For one, the NDA itself, which Prairie attached the amended complaint, does not reference the right of first refusal or any Qualified Loan Sale. Doc. 95 at 6; Doc. 79 at 14. In fact, the only rationale provided in the NDA is Webster and Prairie's "desire to explore the possibility of developing a potential acquisition or investment opportunity for [Prairie] ('Transaction')." Doc. 64-6 at 1. And the NDA cautions that "[n]othing contained in th[e] Agreement shall be construed as a commitment or obligation by the Parties to enter into any additional agreements or to impose any further obligation upon the Parties regarding the Transaction." *Id.* at 3. So, the NDA by its own terms does not support a plausible inference that Webster offered the right of first refusal or that Prairie accepted it. And while Prairie emphasizes that an NDA "is a common industry practice after an offer or [right of first refusal] has been accepted," Doc. 88 at 10, that generalized contention merely suggests that it was "conceivable" that Webster offered and Prairie accepted the right of first refusal. *Twombly,* 550 U.S. at 570. But to survive a 12(b)(6) motion, Prairie must "state a claim to relief that is plausible on its face." *Id.*

The emails that Prairie attaches to the amended complaint are similarly unavailing. Indeed, contrary to Prairie's contentions, those communications make clear that Prairie did *not* understand the parties to have been bound to any agreement to purchase the loans. *See* Doc. 64-9 at 2 ("[W]e're willing to buy the loan."); *id.* at 3 ("We want to buy the loan, but the pace seems a bit slow."); *id.* at 4 ("We have [sic] want to

---

[9] Because Prairie does not allege—or argue in its opposition—that the Loan Assignment Agreement was itself a binding contract, the Court need not analyze whether the Agreement was a "Type I" or "Type II" binding preliminary agreement. *See National Gear & Piston, Inc. v. Cummins Power Systems, LLC,* 861 F. Supp. 2d 344, 355–56 (S.D.N.Y. 2012) (explaining that the theory that an unexecuted contract is a binding express contract is distinct from the theory that a contract was implied in fact from the parties' conduct).

buy the loan but need to hear back from the bank as to the next steps. Our lawyers are speaking to your lawyers to get the agreements filled out, so the ball is in your court."); *id.* ("[S]ince you told us to buy the loan we stand ready to do so. But if we could have a call to confirm the course of action we would be appreciative."); *id.* at 5 ("As bankers you [k]now the wire cut off time is fast approaching, and we still don't have [t]he final docs from you to purchase the loan. Please call or e-mail us as to what is going on."); *id.* at 6 ("Prairie Street has offered to purchase the Webster loans at par but needs to know the payoff amount which we have been requesting for a few days. We hope the Assignment Agreement can be finalized . . . ."). In other words, the emails undermine Prairie's claim that it had previously entered a contract to purchase the Webster Interest. Because Prairie has not plausibly alleged the existence of a contract to purchase the Webster Interest, Count Two is therefore dismissed.

### C.    Breach of Fiduciary Duty (Count Seven)

Count Seven alleges that the Founders Defendants breached their fiduciary duties to Prairie when they facilitated the sale of Richardson's assets for less than their "reasonably equivalent value," Doc. 64 ¶ 187, even though Richardson was insolvent, *id.* ¶ 170.

In New York, corporate officers and directors owe fiduciary duties to the corporation and its shareholders; and once a corporation becomes insolvent, officers and directors also "owe a fiduciary duty to preserve corporate assets for the benefit of the creditors." *United States Small Business Admin. v. Feinsod*, 347 F. Supp. 3d 147, 160 (E.D.N.Y. 2018). Thus, under the "trust fund doctrine," "the officers and directors of an insolvent corporation are said to hold the remaining corporate assets in trust for the benefit of its general creditors." *Id.* (quoting *Credit Agricole Indosuez v. Rossiyskiy Kredit Bank*, 729 N.E.2d 683, 688 (N.Y. 2000)).

The Founders Defendants do not dispute that, under the trust fund doctrine, they had fiduciary duty to preserve Richardson's assets for its creditors. Doc. 90-1 at 16.

They argue, however, that Prairie lacks standing to assert a direct claim based on the trust fund doctrine because, even in insolvency, such claims belong to the corporation—to which the fiduciary duty is owed—rather than its individual creditors. *Id.* And because, in their view, the trust fund doctrine "is the only basis for a fiduciary relationship to exist between [Prairie] and [the Founders] Defendants," they contend that Prairie's individual breach of fiduciary claim fails as a matter of law. *Id.* at 16 n.40, 20.

In response, Prairie concedes that the trust fund doctrine permits only derivative claims asserted on behalf of the corporation—and not direct claims brought by individual creditors. Doc. 98 at 21; *see also Feinsod*, 347 F. Supp. 3d at 161 (explaining that "although [the fiduciaries'] duties shifted to preserving [the insolvent corporation's] assets for its creditors, the breach of fiduciary [duty] claim belongs to the corporation"); *In re Perry H. Koplik & Sons, Inc.*, 476 B.R. 746, 797 (Bankr. S.D.N.Y. 2012), *adopted in part*, 499 B.R. 276 (S.D.N.Y. 2013), *aff'd*, 567 F. App'x 43 (2d Cir. 2014) (predicting that New York courts would hold "that with or without insolvency, neither shareholders nor creditors would have direct claims for breaches of duties owed to the corporation"); *cf. North American Catholic Educational Programming Foundation, Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007) (distinguishing between the "well[-]settled" principle "that directors owe fiduciary duties to the corporation" and the fact that "those duties may be enforced" by creditors via "derivative claims against directors on behalf of the [insolvent] corporation for breaches of fiduciary duties"). Indeed, in recognition of this limitation, Prairie explicitly disclaims any reliance on the trust fund doctrine. Doc. 98 at 21 ("To be clear, Prairie does not invoke the trust fund doctrine.").

Prairie nonetheless argues that it is permitted to bring direct, individual claims against Richardson's fiduciaries because "[o]nce insolvency ensues, the fiduciary duties of corporate officers and directors also extend to creditors." Doc. 98 at 22. But, as the Founders Defendants note, Doc. 101 at 2, that statement—and the cases that Prairie cites in support of it—merely restates the principle underlying the trust fund doctrine. Thus,

14

because Prairie does not dispute that it cannot assert its claims under the trust fund doctrine—or identify any other basis for its assertion of fiduciary duty claims[10]—its breach of fiduciary duty claims must be dismissed.

### D. Negligent Misrepresentation (Count Eight)

Count Eight alleges negligent misrepresentation based on Teeger's representation to Prairie "that the sale of the Richardson assets was going to take place through a public auction," when the sale was in fact conducted through a private UCC sale. Doc. 64 ¶ 189.

"To state a claim for negligent misrepresentation under New York law, the plaintiff must allege that '(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.'" *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 114 (2d Cir. 2012) (quoting *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000)).

"Under the [first] 'duty' element, 'New York strictly limits negligent misrepresentation claims to situations involving actual privity of contract between the parties or a relationship so close as to approach that of privity.'" *Anschutz Corp.*, 690 F.3d

---

[10] Indeed, two of the cases that Prairie cites involved claims asserted by the corporation's trustee in bankruptcy (i.e., derivatively). *See New York Credit Men's Adjustment Bureau v. Weiss*, 305 N.Y. 1 (1953); *Clarkson Co. Ltd. v. Shaheen*, 660 F.2d 506 (2d Cir. 1981). In another cited case, a court did hold that, under Delaware law, "[o]nce a corporation enters 'the zone of insolvency,' the directors owe fiduciary duties not only to the corporation's shareholders but to its creditors as well." *Roselink Investors, L.L.C. v. Shenkman*, 386 F. Supp. 2d 209, 215 (S.D.N.Y. 2004). But, to the extent a case applying Delaware law may be persuasive, the Court notes that that particular case predates the later holding of the Delaware Supreme Court that "a direct claim [by a creditor] arising out of a purported breach of a fiduciary duty owed to that creditor by the directors of an insolvent corporation" is "preclude[d]." *North American Catholic Educational Programming Foundation, Inc. v. Gheewalla*, 930 A.2d 92, 101–103 (Del. 2007). And the remaining cases that Prairie cites do not address Prairie's standing to bring a direct claim for breach of fiduciary duty as an individual creditor.

at 114 (quoting *In re Time Warner Inc. Securities Litig.*, 9 F.3d 259, 271 (2d Cir. 1993)). A relationship is "so close as to approach privity" when: (1) "the defendant makes a statement with the awareness that the statement was to be used for a particular purpose," (2) "a known party or parties rely on this statement in furtherance of that purpose," and (3) "there is some conduct by the defendant linking it to the party or parties and evincing defendant's understanding of their reliance." *Aetna Casualty & Surety Co. v. Aniero Concrete Co.*, 404 F.3d 566, 584 (2d Cir. 2005). Absent privity, a duty of care may also arise "if the defendant has fiduciary obligations to the plaintiff." *Id.* at 584 & n.15. And "[b]ecause '"casual" statements and contacts' are prevalent in business, liability in the commercial context is 'imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified.'" *Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004) (quoting *Kimmell v. Schaefer*, 675 N.E.2d 450, 454 (N.Y. 1996)).

Teeger contends that Prairie has failed to state a negligent misrepresentation claim because it has not plausibly alleged that he and Prairie had a special relationship that would give rise to a duty to provide correct information. Doc. 90-1 at 13. In support of this contention, Teeger highlights that the amended complaint "alleges only that Teeger misrepresented to Prairie that an auction would take place and that as a corporate officer of RFI he would have had to know about the details of the sale." *Id.* (citing Doc. 64 ¶ 191). And he asserts that "Prairie's allegation that [he] was a director and corporate officer of RFI is insufficient to create the special relationship required to prevail on a claim of negligent misrepresentation." *Id.*

In general, "[a] special relationship does not arise out of an ordinary arm's length business transaction between two parties." *High Tides, LLC v. DeMichele*, 88 A.D.3d 954, 960 (2d Dep't 2011). And here, Prairie has not plausibly alleged that the relationship between Teeger and Prairie was anything other than that. At bottom, the only

16

transaction that could potentially give rise to a special relationship with Teeger is Prairie's loan to Richardson. But even assuming that Teeger's status as an officer and director would render him a party to that transaction, New York courts have made clear that "an arm's length borrower-lender relationship . . . does not support a cause of action for negligent misrepresentation" because the relationship "is not of a confidential or fiduciary nature." *Dobroshi v. Bank of America, N.A.*, 65 A.D.3d 882, 884 (1st Dep't 2009); *see also id.* Thus, Teeger's relationship with Prairie cannot give rise to a duty to speak with reasonable care.

In its opposition, Prairie raises three grounds for concluding that Teeger did owe Prairie such a duty. Prairie specifically argues that this duty arose from Teeger's: (1) status as a fiduciary, (2) "special knowledge in accounting and finance" and "expertise regarding the operations and financial condition of" Richardson, and (3) awareness that "Prairie was seeking accurate information to guide its business decisions." Doc. 98 at 12–13. These contentions are without merit.

First, and for the reasons already explained, Prairie's contention that Teeger owed Prairie a fiduciary duty misunderstands the fundamental precept that, even in insolvency, fiduciary duties are owed to the corporation. Second, Prairie's generalized allegation that Teeger is "experienced in accounting and finance" "amounts to nothing more than" an allegation that Teeger had "knowledge of the particulars of the company's business—and the true situation underlying the misrepresentations pertaining to that business." *JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 402 (S.D.N.Y. 2004). But that "does not constitute the type of 'specialized knowledge' that is required in order to impose a duty of care in the commercial context." *Id.* That is especially true here, given that the alleged misrepresentation relates to the manner in which *Webster* sold Richardson's assets—and thus concerns a matter that Teeger's "special knowledge and expertise" of Richardson's "operations and financial condition" would not appear "put him in a superior position to" Prairie. *Chun Hye Kang-Kim v. Feldman*, 121 A.D.2d 590,

17

591 (2d Dep't 1986).  Finally, even assuming that the amended complaint plausibly alleges that "Teeger knew Prairie was seeking accurate information to guide its business decisions,"[11]  Prairie does not cite to any authority that suggests that a person's awareness that another party generally sought "accurate information to guide its business decisions" is a "particular purpose" that triggers a duty of care in New York.  Doc. 98 at 13.  Nor is the Court aware of any such authority.  Because Prairie has not plausibly alleged that Teeger had a duty to give correct information to Prairie, the negligent misrepresentation claim is therefore dismissed.

### E.  The Remaining Claims (Counts Three, Four, Five, Six, Nine, Ten, and Eleven)

As Webster and Roses note, Doc. 79 at 19; Doc. 83 at 14, Prairie's remaining claims for anticipatory breach (Count Three), breach of the covenant of good faith and fair dealing (Counts Four, Five, and Six), constructive trust (Count Nine), accounting (Count Ten), and unjust enrichment (Count Eleven), all depend on Prairie's contention that Webster's sale of Richardson's assets was a Qualified Loan Sale and thus triggered

---

[11]  The Court notes that the only allegations that Prairie cites to in support of this proposition do not refer to Prairie's intentions or plausibly suggest that Teeger was aware of them. *See* Doc. 98 at 13 (citing Doc. 64 ¶ 67 ("Teeger represented to Prairie's President Barry several times, as a representative of the Plaintiff, that the sale of the Richardson Assets was taking place at an auction.  In fact, on March 6, 2020, he told Barry the Richardson Assets were going to be auctioned off next week but could provide no details as to time and location.") and Doc. 64 ¶ 189 ("On or around March 2, 2020, Teeger misrepresented to Prairie that the sale of the Richardson assets was going to take place through a public auction.")).

Prairie's right of first refusal.[12]  Because the Court has already concluded that that assertion is not plausible, these counts are also dismissed.[13]

### F.  Whether the Claims Should Be Dismissed with Prejudice

Webster and Roses finally argue that, if the Court dismisses the claims, it should do so with prejudice because the amended complaint "continues to rely upon the same deficient legal theories and deficient factual allegations as in the initial [c]omplaint." Doc. 79 at 20; *see also* Doc. 83 at 20.  While "a dismissal with prejudice is generally appropriate where *a court* puts a plaintiff on notice of a complaint's deficiencies and the plaintiff fails to correct those deficiencies after amendment," here, Prairie had not received judicial notice of the complaint's deficiencies until this decision.  *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, No. 08 Civ. 7508 (SAS), 2009 WL 3346674, at *2 (S.D.N.Y. Oct. 15, 2009) (emphasis added); *see also id.* at *2 n.14 (collecting cases).  The amended complaint is therefore dismissed without prejudice.

## V.    CONCLUSION

For the reasons set forth above, the motions are GRANTED and the amended complaint is DISMISSED without prejudice.  The Clerk of the Court is respectfully directed to terminate the motions, Docs. 77, 82, 90.

---

[12]  Count Three alleges that Webster "explicitly anticipatorily breached the [right of first refusal provision in Amendment No. 9] . . . when it ignored its obligations to Prairie under [that provision] and gave notice of its intent to dispose of the Richardson 'Collateral' pledged to Webster" on February 5, 2020.  Doc. 64 ¶ 133.  Counts Four through Six allege that Afek, Founders, Haber, Roses (as successor to Richardson), and Webster, breached the implied covenant of good faith and fair dealing by "effectively destroy[ing] Prairie's right to receive the fruits of the [right of first refusal provision]" and "the contract created by Prairie's exercise of the [right of first refusal]."  Doc. 64 ¶¶ 138–39, 143; *see* Doc. 91 at 5, 15–16 (clarifying that Count Six, which seeks a declaration "that Roses is the successor to Richardson," is not an independent claim for relief, but rather a vehicle for asserting that Roses is liable for Count Five under a successor liability theory).  Counts Nine through Eleven assert claims for equitable relief against Roses based on the theory that Roses "had no right to take [Richardson's] assets" because Prairie had exercised its right of first refusal.  Doc. 91 at 18.

[13]  Although Afek, Founders, and Haber did not raise this argument in their motion to dismiss Count Five, *see* Doc. 90-1 at 10–12 (arguing for dismissal of Count Five because Afek, Founders, and Haber were not parties to Amendment No. 9), the Court may dismiss the claim against them because "the issues concerning [them] are substantially the same as those concerning [Webster and Roses], and [Prairie] . . . had notice and a full opportunity to make out [its] claim against" Afek, Founders, and Haber.  *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 26 n.6 (2d Cir. 1990).

Insofar as Prairie seeks leave to further amend its complaint, it is directed to file its motion by April 3, 2026.  Failure to do so will result in the closure of the case.

It is SO ORDERED.

Dated:    March 13, 2026
          New York, New York

_____
EDGARDO RAMOS, U.S.D.J.

20